# Sanchez v. State

Court of Appeals of Texas, Third District, Austin

June 30, 2005, Filed

NO. 03-03-00139-CR

**Reporter**

2005 Tex. App. LEXIS 5084 *; 2005 WL 1536219

Michael Sanchez, Appellant v. The State of Texas, Appellee

**Notice:** **[*1]** PLEASE CONSULT THE TEXAS RULES OF APPELLATE PROCEDURE FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT NO. 00-6317, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING.

Sanchez v. State, 2002 Tex. App. LEXIS 1123 (Tex. App. Austin, Feb. 14, 2002)

**Disposition:** Affirmed.

**Judges:** Before Justices B. A. Smith, Puryear and Pemberton.

**Opinion by:** Bob Pemberton

## Opinion

**MEMORANDUM OPINION**

A jury found appellant Michael Sanchez guilty of capital murder, and the district court sentenced him to life imprisonment. *See* Tex. Pen. Code Ann. § 12.31(a) (West 2003), § 19.03 (West Supp. 2004-05); Tex. Code Crim Proc. Ann. art. 37.071, § 1 (West Supp. 2004-05). On appeal, Sanchez brings four issues: (i) the evidence was insufficient to support conviction because the State used uncorroborated accomplice testimony; (ii) the evidence was factually insufficient to substantiate guilt because the State failed to prove robbery, an essential element of the crime; [1] (iii) the district court erred in denying Sanchez's motion to suppress a video interview; and (iv) the district court erred in failing to suppress audio tapes of phone calls Sanchez made from **[*2]** jail. We will affirm.

[1] Sanchez was indicted for intentionally committing murder in the course of committing or attempting to commit robbery. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West Supp. 2004-05).

Exhibit J

**BACKGROUND**

After 10:00 p.m. on July 12, 2000, Tracy DeLeon drove to George Morales's house in Austin with her two daughters. When she arrived at Morales's house, she sat in her car in his driveway, waiting for him and listening to music when a light-blue pickup truck pulled up and two men got out. As the men approached the house, Morales came to the door and motioned to DeLeon to wait in her car, which she did. The three men went inside. Less than five minutes later, she saw Morales stagger toward her vehicle holding his side, while the two men walked back to their truck and drove away. When DeLeon rolled down her window, Morales told her that he had been shot. DeLeon drove Morales to the hospital, where he died twenty-four hours later.

Austin Police Department Detective **[*3]** Scott Ehlert and crime scene technicians investigated the scene at Morales's house. In his bedroom, they found a triple-beam balance scale that had a powdery residue left on the pan. Later testing identified the substance in the pan as cocaine. There were also two small, rolled-up balloons located next to the scale, which contained what was later determined to be heroin. The police found a safe containing jewelry and a paper bag sealed with duct tape. The paper bag contained a plastic bag, which contained what was later determined to be cocaine. The police also found an empty paper bag, similar to the one in the safe, near the scale. They also recovered a cell phone and a pager in the room. The pager had received a call about half an hour before the shooting. Detective Douglas Skolaut, the primary investigator on the case, later subpoenaed the number that had called the pager and traced it to Sanchez's cell phone.

On July 15, 2000, the Austin Police communications department notified Detective Skolaut that Sanchez had been arrested on an unrelated warrant in Corpus Christi. On July 18, Detectives Ehlert and Skolaut traveled to Corpus Christi to interview Sanchez about the Austin case. **[*4]** By this time, the detectives suspected that Morales was a drug distributor. They knew that Morales's pager had received a call from Sanchez's cell phone shortly before the shooting. The description DeLeon gave of one of the men she saw matched Sanchez, and they knew Sanchez drove a light-blue

pickup similar to the one DeLeon saw at the scene.

Detective Skolaut conducted the interview with Sanchez in the Nueces County Sheriff's interview room. Detective Ehlert watched from an adjoining room, where a civilian employee of Nueces County videotaped the interview. During the interview, Sanchez admitted that he knew Morales. He told Skolaut that he had met Morales to trade heroin for cocaine in the past and had set up such a meeting on the night of the shooting. He did not, however, admit that he was involved in any way with the shooting.

Back in Austin, police discovered Sanchez's light-blue pickup truck at his cousin's apartment and obtained a warrant to search the vehicle. Before the warrant was executed, police watching the apartment observed two men drive the truck away. The police stopped the truck and identified the driver as Ramon Regalado, Sanchez's brother. The police impounded **[*5]** the truck and executed the search warrant, but they did not recover any physical evidence. On July 19, Detective Skolaut interviewed DeLeon and showed her a photo array containing six different suspects, including Sanchez. DeLeon picked the photo of Sanchez and stated that she believed he "looked like one of the people that entered or left [Morales's] house."

While Sanchez was housed at the Nueces County Jail, the police recorded four of his outgoing phone calls to family members. On July 18, Sanchez called Regalado, his brother, and told him that a small piece of his gun had fallen off in the truck. He instructed Regalado to find the piece and throw it away and to then move the truck to their parent's backyard, where it would not be seen. It was while Regalado was attempting to move the truck that he was pulled over by the Austin police. Police then executed a search warrant at the house of Jessie Ramirez, Sanchez's cousin. Ramirez led the police to where he had hidden Sanchez's gun. When the police examined the gun, they found the cylinder release button missing.

Sanchez was indicted for intentionally committing murder in the course of committing or attempting to commit robbery. **[*6]** *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West Supp. 2004-05). In exchange for immunity, Regalado and Ramirez testified at trial against Sanchez. Regalado testified that, on the night


Exhibit J

of the murder, he was at his cousin Adan Ramirez's apartment in Austin. Sanchez arrived in his light-blue pickup truck at about 11:00 P.M. Sanchez was holding an open box of beer. He was drinking fast and appeared "freaked out." After about half an hour, he asked Regalado to drive him around for awhile. While Regalado drove around, Sanchez continued to drink. Then Sanchez took a gun from the box of beer and unloaded it. He told Regalado that he and a friend from Dallas had gone to Morales's house, that this friend had shot Morales, and that they had taken four ounces of cocaine from the house. He told Regalado to drive to their cousin Ramirez's house. When they arrived, Sanchez told Regalado to wait for him in the car while he went inside, which Regaldo did. Sanchez was gone for about ten minutes. When he came back to the car, he no longer had the gun. He asked Regalado to drive him to a motel. Sanchez said he was worried because he thought someone had seen him outside Morales's **[*7]** house. He told Regalado that he wanted to use Regalado's car to go to Corpus Christi the next day. Before leaving, Sanchez told Regalado to leave Sanchez's truck parked at their cousin Adan Ramirez's apartment. Regalado further testified that, after Sanchez's call from jail, he found the small piece from the gun in the bed of the truck and threw it away somewhere off Riverside Drive in Austin.

Ramirez testified that he awoke at about 2:00 a.m. on July 13, 2000, to the sound of someone constantly ringing his doorbell. When he answered the door, he found Sanchez standing outside, holding a box of beer. Ramirez could see the car but could not see who was driving. Sanchez gave Ramirez the gun but did not tell him about the shooting. Sanchez asked Ramirez to alter the gun, so that it could not be used against him later, and to store it for a few days. Ramirez agreed, and Sanchez left. Later that day, Ramirez filed down the firing pin [2] and hid the gun behind a

---

[2] Ramirez apparently believed altering the firing pin would prevent ballistics testing from identifying the gun. When a gun is fired, the firing pin strikes the back of the cartridge, causing primer to ignite the powder and fire the bullet. The firing pin leaves an impression on the cartridge, and this impression can be used as a point of comparison if the police recover discarded cartridges at the scene. In this case, the gun used was a revolver. When a revolver fires, the spent cartridge is left in the cylinder until it is unloaded. This is in contrast to a semi-automatic handgun, which ejects the spent cartridge each time the gun fires. The police did not recover any spent cartridges at the scene because they were in the gun until Sanchez unloaded it in Regalado's car. Therefore, they had nothing to compare. Instead, they performed ballistics tests comparing the bullet which killed Morales to bullets fired from Sanchez's gun. The bullets were a close match, but the police forensics examiner could not say conclusively at trial that the

pile of shovels in a shed on his property.

**[*8]** The district court conducted a pre-trial suppression hearing concerning the videotape of the interview and the audiotapes of Sanchez's phone calls from the Nueces County Jail. The district court denied the motion to suppress. The case was then tried to a jury, which found Sanchez guilty of capital murder. The State did not seek the death penalty, so the district court sentenced Sanchez to life in prison. This appeal followed.

## DISCUSSION

### Accomplice testimony

In his first issue, Sanchez argues that the evidence was insufficient to support a charge of capital murder because the state used uncorroborated accomplice testimony to establish essential elements of the crime. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005); *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); *Wincott v. State*, 59 S.W.3d 691, 698 (Tex. App.--Austin 2001, pet. ref'd). In particular, Sanchez argues that the testimony of Regalado and Ramirez falls under the rule because their participation in the crime made them accomplices to the murder of Morales. Sanchez contends that, without the testimony of Regalado **[*9]** establishing that Sanchez robbed Morales and without the testimony of Regalado and Ramirez connecting Sanchez with the gun, the evidence was insufficient to support conviction.[3] The State replies, in part, that Regalado and Ramirez were not accomplices. *See Medina v*. State, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999); Tex. Pen. Code Ann. § 7.02(a)(2) (West 2003).

**[*10]** An accomplice is one who, acting with the intent to promote or assist the commission of the offense, solicits, encourages, directs, aids, or attempts to aid another person in the commission of the offense. Tex. Pen. Code Ann. § 7.02(a)(2) (West 2003). A person is an accomplice if he participates with the

bullet that killed Morales had come from Sanchez's gun.

[3] The standard of review for accomplice testimony is not legal sufficiency. Rather, the standard derives from the statutory requirement of article 38.14. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). To ensure the reliability of accomplice testimony, there must be sufficient corroborating evidence presented that tends to connect the accused with the crime. *See Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994). The test for sufficient corroboration is to eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense. *Id*.



Exhibit J

defendant before, during, or after the commission of a crime by performing some affirmative act promoting the commission of the offense and who could be prosecuted as a defendant for the same offense or a lesser included offense. *See Medina*, 7 S.W.3d at 641; *Blake*, 971 S.W.2d at 454-55; *McFarland v. State,* 928 S.W.2d 482, 514 (Tex. Crim. App. 1996); *Maynard v. State*, No. 03-03-00359-CR, 166 S.W.3d 403, 2005 Tex. App. LEXIS 4003, at *11-12 (Tex. App.--Austin May 26, 2005, no pet. h.). The fundamental question is whether the person's participation in the commission of the offense rises to such a level as to make that person a "blame-worthy participant." *Blake*, 971 S.W.2d at 455. There must be sufficient evidence in the record to support a charge against the alleged witness as a party for the **[*11]** same offense as the defendant, or for a lesser-included offense of the offense charged against the defendant. *Id*. The evidence must show that the witness "harbored the specific intent to promote or assist the commission of the offense." *Pesina v. State*, 949 S.W.2d 374, 382 (Tex. App.--San Antonio 1997, no pet.).

Before 1974, the accomplice-witness rule applied even to a witness who participated only after commission of the offense--an accessory after the fact. *See Easter v. State*, 536 S.W.2d 223, 227-28 (Tex. Crim. App. 1976); *Reyna v. State*, 22 S.W.3d 655, 658-59 (Tex. App.--Austin 2000, no pet.). However, the law of parties in Texas was changed in 1974. The legislature eliminated the old classification of accessory after the fact and replaced it with section 38.05, defining the separate crime of "hindering apprehension or prosecution." *See* Tex. Pen. Code Ann. § 38.05 (West 2003); *Navarro*, 863 S.W.2d at 201. Acts committed after the offense is completed, although they aid the wrongdoer and are sufficient to constitute the independent offense of hindering prosecution, cannot make the **[*12]** actor an accomplice to the offense. *Pesina*, 949 S.W.2d at 383. It is not enough that the witness was merely present at the commission of the crime, that the witness knew of the crime and failed to disclose it, or even helped to conceal it. *See Creel v. State*, 754 S.W.2d 205, 213-14 (Tex. Crim. App. 1988); *Easter*, 536 S.W.2d at 225. Because an accessory after the fact is no longer considered to be an accomplice witness, the testimony of such an actor does not need to be

corroborated. *Harris v. State*, 738 S.W.2d 207, 215-16 (Tex. Crim. App. 1986). Instead, the jury is permitted to evaluate the credibility of the testimony as they would any other witness. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

Neither Regalado nor Ramirez assisted in any way with planning, promoting, or encouraging the murder. *See Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986) (witness who knew of planned robberies, was present during commission, and shared in proceeds, but did not plan or encourage them was not accomplice). Regalado lent Sanchez a car so that he could leave Austin. **[*13]** He disposed of a piece of the gun at Sanchez's direction. He had knowledge of the crime and failed to report it. These acts were not sufficient to make Regalado an accomplice to the murder of Morales. *See Worthen v. State*, 59 S.W.3d 817, 819-21 (Tex. App.--Austin 2001, no pet.) (witness who disposed of pistol used in robbery was not accomplice); *see also Rushing v. State*, 813 S.W.2d 646, 648-49 (Tex. App.--Houston [14th District] 1991, pet. ref'd) (witness who saw murder and failed to report it was not accomplice). Ramirez altered and hid the gun for Sanchez but was not even told of the crime. Merely tampering with or destroying evidence after a crime has been committed is also insufficient to create accomplice liability. *See Worthen*, 59 S.W.3d at 819-21; *In re M. L.*, 602 S.W.2d 550, 553-54 (Tex.Civ.App.--Corpus Christi 1980, no pet.) (witness who knowingly destroyed stolen property was not accomplice).

Regalado and Ramirez did not act with the specific intent to aid in the commission of the crime because the crime was committed before they became involved. *See Pesina*, 949 S.W.2d at 382; *Navarro v. State*, 863 S.W.2d 191, 201 **[*14]** (Tex. App.--Austin 1993, pet. ref'd). Although their actions might have constituted the offense of hindering prosecution under section 38.05, [4] it cannot be said that they became "blame-worthy participants" in the murder of Morales. *See Blake*, 971 S.W.2d at 455. Therefore, we agree with the State that Regalado and Ramirez were not accomplices, and their testimony did not require corroboration. Because Sanchez provides no sufficiency

[4] Again, Regalado and Ramirez were granted testimonial immunity at trial.


Exhibit J

argument in this issue separate from the claim of accomplice testimony, we overrule Sanchez's first issue.

**Factual sufficiency**

In his next issue, Sanchez argues the evidence was factually insufficient to substantiate guilt because the State failed to prove an essential element of the crime. The jury convicted Sanchez of murder in the course of a robbery. Tex. Pen. Code Ann. § 19.03(a)(2). Sanchez contends that the evidence produced at trial was **[*15]** factually insufficient to prove the robbery, and that it supports only the conclusion that the murder was committed during a "drug deal gone bad." Sanchez contends that Regalado's testimony that Sanchez "got" four ounces of cocaine from Morales was not conclusive proof that a theft occurred. Finally, Sanchez argues that the drugs and other valuables left in the room show that he was not there to rob Morales.

When reviewing the evidence for factual sufficiency, we look at the evidence for both the prosecution and defense in a neutral light to determine if the evidence supporting the verdict is greatly outweighed by contrary evidence. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). We can only reverse a conviction for factual insufficiency if the jury was not rationally justified in finding guilt beyond a reasonable doubt. *Id*. The jury is not rationally justified in finding guilt when evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt, or when the evidence contrary to guilt is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Id*. Due deference must still be afforded **[*16]** the trier of fact, particularly in issues involving weight and credibility of evidence, but we can disagree with the result to prevent manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000).

The elements of robbery are: (1) intent to obtain or maintain control of property, (2) intentionally, knowingly, or recklessly causing bodily injury to another, or intentionally or knowingly threatening or placing another in fear of imminent bodily injury or death, (3) while in the course of committing theft. Tex. Penal Code Ann. § 29.02 (West 2003). The offense is aggravated if the actor causes



Exhibit J

serious bodily injury, uses or exhibits a deadly weapon, or robs a person who is disabled or over 65 years old. *Id*. § 29.03. One element of any theft offense, including robbery, is the actor's intent to deprive the victim of property. Tex. Penal Code Ann. § 31.03(a) (West 2003 & Supp. 2004-05).

Reviewing the evidence introduced at trial, we conclude that the jury could rationally find guilt beyond a reasonable doubt. Regalado testified that Sanchez told him that Sanchez's partner shot Morales and that Sanchez **[*17]** "got" four ounces of cocaine from Morales's home. The jury could reasonably infer that Sanchez and his partner shot Morales so that he could not prevent them from taking the cocaine. The jury heard from Detective Ehlert that, based on its similarity to the package of cocaine in the safe, the empty paper bag had probably contained a plastic bag of cocaine that was now missing. In Ehlert's view, this was probably the source of the loose cocaine left on the scale. Ehlert testified that the package in the safe contained about nine ounces of cocaine worth approximately $ 5,000. The cocaine left on the scale weighed about fourteen grams, and was worth about $ 500. He also testified that the heroin left at the scene was worth about $ 50. The four ounces of cocaine taken was worth approximately $ 2,500. The jury could infer that Sanchez and his partner shot Morales to take more cocaine than Morales agreed to trade for their heroin.

As for the other valuables left behind, the State did not have a burden to prove that Sanchez was an effective thief. The State does not even have to show a completed theft. Sanchez was charged with committing murder in the course of committing or attempting to **[*18]** commit robbery, and the graveman of robbery is the assaultive conduct, not the theft. *See Purser v. State*, 902 S.W.2d 641, 647 (Tex. App.--El Paso 1995, pet. ref'd) (evidence that after assault had been committed, defendant rummaged through desk drawers sufficient to show robbery, even though no evidence of missing property). The fact that he did not steal everything he conceivably could does not prevent the jury from concluding that he did, in fact, intend to steal the cocaine. Therefore, the evidence of guilt was not too weak to support the finding, and the evidence contrary to guilt was not so strong that the beyond-a-reasonable-doubt standard could not have



Exhibit J

been met. We overrule Sanchez's second issue.

**Admissibility of video**

In his third issue, Sanchez argues that the district court erred in failing to suppress the video of his interview from the Nueces County jail because the State failed to prove the competency of the video operator. *See* Tex. Code Crim. Pro. art 38.22 § 3(a)(3) (West 2005). Sanchez points to the evidence which shows that the time and date on the tape were incorrect, that the detectives did **[*19]** not know the name or qualifications of the operator, and that the detectives did not actually witness the camera being operated. In response, the State argues, in part, that because Detective Skolaut testified that the tape was a fair and accurate representation of the interview, the court could infer the competency of the operator.

The determination of whether the proponent of videotaped evidence has complied with the proper predicate for admission is discretionary with the district court. *McEntyre v. State*, 717 S.W.2d 140, 146 (Tex. App.--Houston [1st District]1986, pet. ref'd). Article 38.22 of the code of criminal procedure controls the admission of videotaped statements made by an accused as a result of custodial interrogation. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West 2005). Its requirements are to be strictly construed. *Id*. § 3(e). The district court must be satisfied, among other requirements, that "the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered" before it may admit a videotaped statement. *Id*. at **[*20]** § 3(a)(3). The district court is within its discretion to infer that the requirements of section 3(a)(3) have been met if the tape is an accurate portrayal of the interview. *See Maldonado v. State*, 998 S.W.2d 239, 246 n.9 (Tex. Crim. App. 1999) ("Appellant urges that the addition of Article 38.22 § 3(e) regarding strict construction of this article means the accuracy of a recording can no longer be shown by the testimony of a witness to the recorded conversation. . . . We do not find his argument compelling."). If the final product accurately portrays the interview, then it can be inferred that the operator was competent. *Falcetta v. State*, 991 S.W.2d 295, 298-99 (Tex. App.--Texarkana 1999, no pet.).



Exhibit J

Sanchez challenged the competency of the operator by pointing to the incorrect time and date shown on the tape and the testimony of detectives Skolaut and Ehlert that they did not know the operator's qualifications. He did not challenge the completeness or accuracy of the recording. Detective Skolaut testified that the tape was a fair and accurate representation of the interview he conducted with Sanchez. Detective Ehlert testified that the operator **[*21]** appeared to be competent. From this testimony, the district court could infer that the video camera functioned properly. Consequently, the district court could infer that the operator of the camera was competent. Therefore, the district court was within its discretion in admitting the videotape. We overrule Sanchez's third issue.

**Admissibility of phone calls**

In his final issue, Sanchez argues that the district court erred in admitting into evidence tape recordings of phone calls he made from the Nueces County Jail. *See* Tex. Code Crim. Proc. Ann. art. 18.20, § 2 (West 2005).

Section 16.02, the Texas wiretap statute, prohibits the unauthorized interception, use, or disclosure of oral communications. Tex. Pen. Code Ann. § 16.02 (West Supp. 2004-05). Article 18.20 and section 16.02 are modeled on the federal anti-wiretap statute. *See* 18 U.S.C.A. 2511 (West 2000). In interpreting the Texas statute, it is appropriate that we consider the interpretation of the federal statute on which it was modeled. *Castillo v. State*, 810 S.W.2d 180, 183 (Tex. Crim. App. 1990). The legislative **[*22]** history of the federal statute reveals that Congress's intent was to protect persons engaged in oral communications under circumstances justifying an expectation of privacy. *See United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978). Although being in custody does not strip one of all rights, persons in jail generally have a lessened expectation of privacy because "in prison, official surveillance has traditionally been the order of the day." *Lanza v. New York*, 370 U.S. 139, 143, 8 L. Ed. 2d 384, 82 S. Ct. 1218 (1962); *Ex parte Graves*, 853 S.W.2d 701, 705-06 (Tex. App.--Houston [1st District] 1993, pet. ref'd).

Sanchez's argument ultimately turns on



Exhibit J

consent rather than on his privacy expectation. It is an affirmative defense to prosecution under section 16.02 that one of the parties to the communication gives prior consent to the interception. Tex. Pen. Code Ann. § 16.02(c)(3)(A). Notably, the consent of both parties is not required. [5] *See id*. Contents of an intercepted communication and evidence derived therefrom may be admitted into evidence "unless the communication was intercepted in violation of **[*23]** this Article, Section 16.02, Penal Code, or federal law." Tex. Code Crim. Proc. Ann. Art. 18.20, § 2(1) (West 2005).

Lieutenant Kerry Lane of the Nueces County Sheriff's Department testified at the pre-trial suppression hearing concerning the recording system at the Nueces County Jail. All calls made by inmates are made collect. **[*24]** The recipient of the call hears the following admonishment: "The next call may be monitored or recorded. If you consent to this call being recorded and accept the charges, press zero." The call is not connected unless the recipient presses zero.

Lane's testimony establishes that all calls out include the admonishment. Sanchez produced no evidence suggesting the recipients of his phone calls did not hear the admonishments. Therefore, we can infer from the evidence only that the admonishment was given and the recipient pressed zero, indicating consent to the interception and recording of the call. Therefore, the interception is not a violation of article 18.20, and the recordings were admissible. We overrule Sanchez's final issue

**CONCLUSION**

Having overruled all of Sanchez's issues, we affirm the judgment of the district court.

Bob Pemberton, Justice

---

End of Document

[5] The federal statute contains a similar provision. *See* 18 U.S.C.A. 2511(2)(c) (West 2000). The court of criminal appeals has adopted the Fifth Circuit's view that if one party consents to a recording it brings the recording within the ambit of section 2511(2)(c). *Rovinsky v. State*, 605 S.W.2d 578, 581-82 (Tex. Crim. App. 1980) (adopting holding of *United States v. Juarez*, 573 F.2d 267 (5th Cir. 1978)); *cf. Jandak v. Brookfield*, 520 F. Supp. 815, 825 (D. Ill. 1981) (party to conversation assumes risk that other party will consent to its recording).



Exhibit J